C. KOWALSKI, INC., Respondent,

v.

Michael DAVIS, et al., Appellants.

No. C2–90–2639.

Court of Appeals of Minnesota.

July 2, 1991.

Review Denied Sept. 13, 1991.

Wendy E. Weil, Carol H. Lostetter, Weil & Sanger, Ltd., Delano, for respondent.

James A. Wellner, Jack Nordby, Meshbesher & Spence, Ltd., Minneapolis, for appellants.

Considered and decided by PARKER, P.J., and PETERSON, and MULALLY,* JJ.

## OPINION

EDWARD D. MULALLY, Judge.

Appellants challenge the trial court's order finding that respondent had a validly perfected mechanics' lien, ordering its foreclosure, and awarding attorney fees. We affirm.

## FACTS

Respondent C. Kowalski, Inc., a carpentry firm owned by Clarion Kowalski, brought this action to foreclose a mechanics' lien arising out of the construction of a house for appellants Michael W. and Margaret McPhail Davis in Minnetrista, Minnesota.

Beginning in the summer of 1985, the Davises hired appellant D.F. Florek Corporation (the general contractor) to build a single-family house for the couple. Paul Jaunich designed the house and participated in its construction.

Jaunich testified that in designing the house, he was asked to design an office on the second floor to accommodate Margaret McPhail Davis' court reporting business. The house plans contain a room entitled "office" that is 24' x 16'6" in dimension. Kowalski testified that he was aware that the office was designed to be used in Margaret McPhail Davis' business. The Davises maintain that the "office" was not ultimately used as an office because of the inconvenience of operating the business from the house.

The parties dispute the square footage of the house. Kowalski testified that according to his measurements the house was 5,200 square feet in area. Jaunich, in contrast, testified that the structure had an area of only 3,800 square feet. On cross-

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

examination, however, Jaunich conceded that he did not measure the structure and therefore did not know the actual square footage of the house. In her deposition, Margaret McPhail Davis testified that based on Michael Davis' measurements the house was 5,050 square feet.

In order to prepare his bid for the house, D.F. Florek solicited bids for carpentry work on the project. All bidders on the project based their bids on an eight page blueprint plan of the proposed house. Respondent, through its owner, submitted an oral bid of $23,771. The bid, subsequently reduced to writing, did not contain any breakdown of the specific work that would be performed under the bid.

During the course of construction, the Davises decided to delete a gazebo originally planned for the center of the structure and replaced it with a tower on the end of the house. Kowalski did not do any siding work on the house.

After receiving one payment of $17,262 for part of the work, on March 18, 1986 Kowalski submitted a billing statement to Florek requesting final payment of $13,718. The sum reflected extra charges of $7,209 but no deletion for the gazebo or for wood siding. Ultimately, Kowalski submitted a revised bill reflecting a $2,000 deletion for the gazebo with a total sum due of $11,718.

Appellants principally dispute two aspects of Kowalski's bill: (1) a deduction of $2,000 rather than $4,500 for the deleted gazebo; and (2) no deletion for siding after the exterior was changed to brick.

Florek and Kowalski gave differing versions of the appropriate deduction for the gazebo that was deleted from the original plans. Kowalski maintains that Florek suggested a $2,000 deletion for the gazebo and that Kowalski assented. Conversely, Florek denies agreeing to a $2,000 deduction and contends that a $4,500 reduction from the original bid price was appropriate.

Kowalski testified that he believed at the time of bidding that the siding work was not to be included in his bid. Gary Lebovsky, one of Kowalski's employees on the project, testified that Kowalski believed that the siding was not included. Lebovsky remembers having seen the house plan in the summer of 1985 and noting that the plan appeared to call for lap siding. He testified in part:

> I asked what kind of siding it would be because if it was the same siding we were putting on, it's a little, narrow lap siding and it takes a long time to do, and this one had a considerable amount of siding, so I asked him what the siding was and *he said there was no siding, it was going to be an all-brick exterior so we wouldn't have to worry about siding.*

(Emphasis added.)

In contrast, Dale Florek testified that the plans submitted to the potential subcontractors called for wood siding. In July of 1985, when Florek asked for the Kowalski bid in writing, he stated:

> I need this bid in writing because we will have to sit down at a later date to figure out where we were because the owner is going to be making some chang[es] and they are thinking [of] doing some brick work.

Florek maintains that he based his bid to Davis for the whole project on using wood siding.

Jaunich, the project designer, testified that the exterior plan was not changed to brick until a meeting with Florek and the Davises on September 7, 1985, after Kowalski submitted his bid.

Following a bench trial, the court issued an order finding a validly perfected mechanics' lien in the amount of $11,717.55 plus interest, costs and attorney fees. After the dismissal of the initial appeal in this matter because the trial court had not awarded attorney fees, the trial court issued an amended order for judgment awarding attorney fees of $14,195, interest of $3,781.19, costs and disbursements of $723.45 in addition to the lien recovery of $11,717.55 for a total recovery of $30,417.19. The district court subsequently entered judgment in the amount of $30,525.97 against each of the appellants.

## ISSUES

1. Did the trial court err by ruling that respondent need not give pre-lien notice?

2. Did the trial court properly calculate the amount of the lien?

3. Did the trial court award excessive attorney fees?

## ANALYSIS

### I.

■ In a mechanics' lien proceeding, the appellate court must sustain the trial court's findings if they are supported by evidence in the record. *Heyn v. Braun,* 239 Minn. 496, 501, 59 N.W.2d 326, 329–30 (1953). When reviewing a decision reached by a court sitting without a jury, this court's scope of review is limited to determining "whether the trial court's findings are clearly erroneous, either without substantial evidentiary support or based on an erroneous conclusion of law." *Warthan v. Midwest Consol. Ins. Agencies,* 450 N.W.2d 145, 147 (Minn.App.1990) (footnote omitted). "Mechanics' lien laws are strictly construed as to the question whether a lien attaches, but are construed liberally after the lien has been created." *Dolder v. Griffin,* 323 N.W.2d 773, 780 (Minn.1982) (quoting Annot., 76 A.L.R.3d 605, 618 (1977)).

■ Generally, a lien claimant must give pre-lien notice to a homeowner before a court will enforce the lien. Minn.Stat. § 514.011, subd. 2 (1984). Minn.Stat. § 514.011, subd. 4c(a), however, carves out an exception:

> The notice required by this section shall not be required to be given in connection with an improvement to real property which is not in agricultural use and which is wholly or partially *nonresidential in use* if the work or improvement:
>
> (a) is to provide or add more than *5,000* total *usable square feet of floor space.*

(Emphasis added.) Here, the trial court ruled that pre-lien notice was not required because the area of the house exceeded 5,000 square feet and the office constituted a partially non-residential use.

### A. *Usable Square Feet of Floor Space*

Minnesota statutes do not define the term "usable square feet of floor space." A court interpreting words and phrases undefined by the statute "construe[s] [the terms] * * * according to their common and approved usage." Minn.Stat. § 645.-08(1) (1990). Generally, the term "usable" may be defined as "[c]apable of being used" or "[i]n a fit condition for use; intact or operative." American Heritage Dictionary 1330 (2d Coll.Ed.1982). Appellant urges the court to interpret the term to essentially mean "*liveable* square feet of floor space." In contrast, respondent urges a broader interpretation, adopted by the Wisconsin appellate courts, that "usable square feet of floor space" encompasses all square feet within the exterior walls of the structure. *Sullivan Bros. v. State Bank of Union Grove,* 107 Wis.2d 641, 649, 321 N.W.2d 545, 549 (1982).

The *Sullivan* court, relying on an administrative interpretation that employed the term "usable floor area" held that a broad interpretation of the term was warranted. Rejecting an argument similar to appellants' in this case, the court reasoned in part:

> Floor space may have a "use" when any structure, permanent, semipermanent, or temporary, is placed on it. Consequently, we believe the legislature did not intend that the floor space beneath columns, walls, stairs or partitions should be deducted to arrive at the usable square feet of floor space. The term "usable square feet of floor space" includes all of the floor area within the inside surface of the outside walls.

*Id.* We find the *Sullivan* reasoning persuasive.

■ The *Sullivan* interpretation is consistent with the common-sense meaning of "usable square feet of floor space" in the context of a residence. Contrary to appellants' argument, garage space is usable by the owner. Moreover, the legislature could have used the term "liveable" rather than "usable" in enacting the exception to the pre-lien notice requirement, but did not do so. The legislature excepted a mechanics'

lien claimant from giving notice when a construction project exceeded a given dimension (i.e. 5,000 square feet). The contractor can more readily determine whether notice is necessary by examining the total square footage of the property. We, therefore, hold that in determining whether a given structure exceeds 5,000 square feet of usable floor space, the party should measure the area within the inner surface of the exterior walls.

■ The record contains testimony from Kowalski that, based on his measurements, the total improvement was 5,200 square feet in area. Further, Mrs. Davis testified that the house was over 5,000 square feet. Specifically, the deposition provides:

Q. I have one other question for you, and that is, do you happen to know the total square feet of floor space in your home?

A. Michael measured it off the blueprint, and he came up with a figure of 5050.

Q. Five thousand fifty square feet?

A. Right.

Appellant objected to the Davis testimony regarding the dimension as hearsay at the time the deposition was entered into the record, but did not object during the deposition. The court did not rule on the objection at trial.

■ Respondent argues that the hearsay objection was waived because it was not made during the deposition. We disagree. Pursuant to Minn.R.Civ.P. 32.02,

objection may be made at the trial * * * to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of evidence if the witness were then present and testifying.

Herr and Haydock explain the provision as follows:

Rule 32.02 makes clear that the court determines the admissibility of the deposition testimony in the same manner as if the witness were then present and testifying at the trial.

2 D. Herr & R. Haydock, *Minnesota Practice* § 32.14 (1985). We conclude that the hearsay objection was properly raised.

■ Having concluded that the objection was timely, we nevertheless find that the testimony was properly admissible. Respondent argues that the statement is an admission by a party opponent and therefore non-hearsay. We agree. In order to constitute an admission, the court must find that "[t]he statement is offered against a party and is * * * the party's own statement, in either an individual or a representative capacity." Minn.R.Evid. 801(d)(2). Here, the statement made by one of the appellants is against the appellants' collective interest.

Admittedly, Paul Jaunich testified that the house was only 3,800 square feet. This testimony, however, was severely discredited on cross-examination by Jaunich's own admission that he had not measured the property. We conclude that the trial court's finding that the structure contained in excess of 5,000 square feet of usable floor space was based on ample evidence in the record.

### B. *Non-residential Use*

■ Again, the statute does not specifically define "non-residential use." This court, therefore, must look to the words' common everyday meaning. Minn.Stat. § 645.08(1).

In *Christle v. Marberg*, 421 N.W.2d 748 (Minn.App.1988), this court held that a "residential development" was not rendered partially "non-residential" in character because it also contained dedicated streets and drainage areas. *Id.* at 751. The court found the streets and drainage areas "merely incidental to the residential development. They do not constitute a non-residential use." *Id.* The panel envisioned circumstances in which notice could be required for large residential projects such as multi-story apartments or condominiums. *Id.* Appellant thus urges that if notice is necessary for large developments, surely notice should be necessary for a single-family house. We disagree.

Unlike this case, no evidence before the *Christle* court indicated that the improvement was intended for anything other than a residential development.

In this case, the record shows that appellants intended throughout the statutory 45 day pre-lien notice period that the structure contain a sizeable office. The plans called for the installation of substantially more electrical outlets for computer use than is normal in a residence and special locks on the office to allow access for employees while not allowing access to the main part of the house. Indeed, ample testimony supports a finding that McPhail Davis planned to operate a business from the house.

The fact that the use of the room changed at a later date has little relevance to the issue of whether pre-lien notice should have been given. A contractor failing to give notice does so at his own peril. Assuredly, the better practice would be to give notice in all cases. However, the mere fact that respondent chose not to give notice in this case and then ultimately prevailed on the merits does not invalidate the court's determination.

We also find misplaced appellant's reliance on *Briggs v. Hendricks*, 197 S.W.2d 511 (Tex.Cir.App.1946), a case holding that a physician may practice medicine from the house without violating a covenant to use the property for residential purposes. *Id.* at 513. *Briggs* is inapplicable in this case because the court specifically distinguished between a "learned calling" such as medicine, and a trade or business in concluding that the residential restriction did not prevent a semi-retired physician from treating patients in his house. *Id.* Court reporting is more in the nature of a business. This distinction was reaffirmed in *Vaccaro v. Rougeou*, 397 S.W.2d 501 (Tex.Cir.App. 1965):

> Doctors and lawyers, from time to time, may find it necessary or convenient to see patients or clients in their homes and frequently discuss business matters over their home telephones. * * * Other uses may be made of a residence which might technically be considered a business use, but these activities, commonly carried on at the residence of business and professional people, might well be considered residential uses where they are clearly incidental to the use of the house as a residence.

*Id.* at 504. Having drawn this distinction, the court concluded that the use of one-half of the garage as a beauty parlor violated the covenant to use the property for residential purposes. *Id.; see Johnson v. Guarino*, 22 Conn.Supp. 235, 237, 168 A.2d 171, 172 (1960) (a beauty parlor is not a residential purpose). We conclude that the court properly ruled that a portion of the improvement was to be used for non-residential purposes.

## II.

Next, appellant contends that the court improperly calculated the amount of the lien. We disagree. Appellants' challenge goes basically to two aspects of Kowalski's bill: an improper deletion for the gazebo and no deletion for the wood siding.

■ The deletion of the gazebo was a hotly contested issue at trial. Kowalski maintains that he and Florek, the general contractor, agreed to a $2,000 deletion for the gazebo. Florek denies the agreement and argues a $4,500 deletion was more appropriate. Jaunich estimates that $4,000 was more appropriate. When a court sits without a jury, it must resolve evidentiary conflicts. *Asp v. O'Brien*, 277 N.W.2d 382, 384 (Minn.1979). The record supports the court's finding in this case.

■ The parties also strenuously disputed whether a deletion of the siding was appropriate. Kowalski maintains that a deletion is not necessary because siding was never part of the bid price. In support of his argument, Lebovsky relates a conversation he had with Kowalski in which he asked what kind of siding was to be used and was told by Kowalski that the owner (Davis) was going to use brick, rather than siding.

Florek and Jaunich dispute this testimony by pointing to the blueprints that called for brick. (The dispute centered on which of the two plans was the bidding document.) Jaunich maintains that the plans were not changed until September 7, 1985. Further, Florek testified that Kowalski acknowledged the need to delete the siding

and even at one point refused to do so because "the playboy doctor can afford it."

All of this testimony, however, was before the trial court. We cannot say that the trial court's ruling was in error.

## III.

Finally, appellant challenges the attorney fees as excessive. The trial court has discretion to award to the prevailing party attorney fees in a mechanics' lien foreclosure action. *Enviro-Fab, Inc. v. Blandin Paper Co.*, 349 N.W.2d 842, 848 (Minn.App.1984). In deciding the amount to be awarded, the factors the court should consider are the:

1) time and effort required,
2) novelty or difficulty of the issues,
3) skill and standing of the attorney,
4) value of the interest involved,
5) results secured at trial,
6) loss of opportunity for other employment,
7) taxed party's ability to pay,
8) customary charges for similar services, and
9) certainty of payment.

*Jadwin v. Kasal*, 318 N.W.2d 844, 848 (Minn.1982). The award, however, should bear a "reasonable relation to the amount of the judgment secured." *Northwest Wholesale Lumber, Inc. v. Citadel Co.*, 457 N.W.2d 244, 251 (Minn.App.1990) (citing *Asp*, 277 N.W.2d at 385). Further, an "award must be made with caution to avoid discouraging valid claims." *Bloomington Elec. Co. v. Freeman's, Inc.*, 394 N.W.2d 605, 608 (Minn.App.1986).

Here, respondent's counsel sought fees for 168 hours of services. In support of the request, respondent's counsel submitted a detailed affidavit documenting the basis of the fees calculation: respondent's counsel prepared for and conducted two lengthy depositions, went to arbitration, participated in a two day trial, defended a motion for a new trial and defended the initial appeal in this case that was ultimately dismissed by order of this court.

At the motion for a new trial, appellants did not object to the hourly rate charged or to the number of hours expended in the litigation.

Here, the trial court awarded $14,195 in attorney fees on a total lien recovery of $15,222.49. Although this amount is substantial, we do not find the attorney fees excessive in light of the work expended in this litigation. We also do not believe that *Asp* is controlling in this case. In *Asp*, the respondent was successful in defending and then reducing the total lien claim. The supreme court reduced the award at least in part in recognition of that fact. *Asp*, 277 N.W.2d at 385. Here, respondent prevailed in all respects on its mechanics' lien claims. We find no error in the amount of attorney fees awarded.

## DECISION

The trial court properly ruled that prelien notice was not required, correctly calculated the amount of the lien, and awarded fees that are adequately supported by the record.

Affirmed.